IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

THE ROUND UP ASSOCIATION,          )
an Oregon corporation,             )
                                   )
              Plaintiff,           )    TC-MD 110865N
                                   )
       v.                          )
                                   )
UMATILLA COUNTY ASSESSOR,          )
                                   )
              Defendant,           )
                                   )
       and                         )
                                   )
DEPARTMENT OF REVENUE,             )
State of Oregon,                   )
                                   )
          Defendant-Intervenor.    )    **CORRECTED DECISION**

This Corrected Decision is issued to resolve a typographical error on the final page of the

original Decision, entered on December 27, 2012. The text of the Conclusion paragraph of the

original Decision should have stated that the subject property is <u>not</u> entitled to property tax

exemption for the 2011-12 tax year. All other substantive elements of the original Decision

remain unchanged.

Plaintiff challenges Defendant Umatilla County Assessor's (the County) denial of its

application for property tax exemption for property identified as Accounts 109274, 109334,

109348, 109378, 109379, 109381, 109446, 109433, 136366, 136368, 136369, 136371, 136370,

136388, and 136372 (subject property) for the 2011-12 tax year. (Ptf's Compl at 2, Ex B, *see

also* Joint Stip Fact at 3 ¶11). A trial was held in the Tax Courtroom on July 23, 2012, and July

24, 2012. Dan Eller, Attorney at Law, appeared on behalf of Plaintiff. Dennis Hunt (Hunt),

President of Plaintiff, and Carl Culham (Culham), Treasurer of Plaintiff, testified on behalf of

Plaintiff. Melisse S. Cunningham, Senior Assistant Attorney General, and Nathan Carter, Assistant Attorney General, appeared on behalf of Defendant-Intervenor Department of Revenue (the Department). Douglas R. Olson, Umatilla County Counsel, and Paul Chalmers (Chalmers), Director of Umatilla County Assessment & Taxation, appeared on behalf of the County. Chalmers testified on behalf of the County and the Department.

The parties filed a Joint Stipulation of Fact. Plaintiff's Exhibits 1 through 13 and 17 through 19 and the Department's Exhibits A through L were admitted without objection.[1] The Department objected to the relevance of Plaintiff's Exhibits 14, 15, and 16; those exhibits include documents dated in 2012. The court admitted Plaintiff's Exhibit 14, pages 1, 2, 3, 7, and 8, and Plaintiff's Exhibit 15, pages 1, 2, 4, and 5, over the Department's objection because Plaintiff's witnesses testified that the events described in those exhibit pages occurred in 2010 and 2011 as well as 2012. The court excluded Plaintiff's Exhibit 16 as irrelevant to the tax year at issue.

At the conclusion of Plaintiff's case, the Department moved for dismissal of Plaintiff's appeal under Tax Court Rule (TCR) 60.[2] Under TCR 60, "the moving party must demonstrate that the record contains no evidence to support the nonmoving party's claim or claims. The court will not weigh the evidence; rather, it will consider the entire record and afford the nonmoving party all reasonable inferences drawn therefrom, in the light most favorable to that party." *Freitag v. Dept. of Rev.* (*Freitag*), 18 OTR 368, 373-74 (2005) (citations omitted).

The primary issue presented in this appeal is whether the subject property is entitled to property tax exemption under ORS 307.130(2) for the 2011-12 tax year as a "charitable

---

[1] Defendants' Exhibits include G-1 and L-1 and revised Exhibit J.

[2] TCR 60 is made applicable through the Preface to the Magistrate Division rules, which states in pertinent part that, "[i]f circumstances arise that are not covered by a Magistrate Division rule, rules of the Regular Division of the Tax Court may be used as a guide to the extent relevant."

institution." To determine whether Plaintiff is a "charitable institution" within the meaning of ORS 307.130(2), the court must consider the three-part test set forth in *SW Oregon Pub. Def. Services v. Dept. of Rev*. (*SW Oregon*), 312 Or 82, 89, 817 P2d 1292 (1991). To apply the *SW Oregon* test, the court must consider numerous factors identified in previous decisions of the Oregon Supreme Court and this court, as well as in OAR 150-307.130-(A). *See, e.g.*, *Oregon Methodist Homes, Inc. v. State Tax Comm'n* (*Methodist Homes*), 226 Or 298, 309-10, 360 P2d 293 (1961) (identifying six relevant factors considered by the Court). The parties provided extensive stipulated facts and Plaintiff's witnesses testified at length concerning Plaintiff's activities and operations. Plaintiff's evidence and testimony must be weighed in accordance with the multi-factor analysis set forth by the courts. However, under *Freitag*, the court will not weigh the evidence and must consider the record "in the light most favorable" to Plaintiff. The court denied Defendant's motion to dismiss because Plaintiff provided some evidence in support of its claim for exemption and the court cannot weigh that evidence under *Freitag*.

At the conclusion of Chalmers' testimony, Plaintiff moved to strike the entirety of Chalmers' testimony under Tax Court Rule-Magistrate Division (TCR-MD) 10. Plaintiff asserted that the County did not fully respond to Plaintiff's request for the County's "exemption file," noting, for example, that an exemption file would typically include "hand written notes." Chalmers testified under oath that he provided the entire "exemption file" to Plaintiff. The court denied Plaintiff's motion to strike because Plaintiff provided no reliable evidence in support of its assertion that the County failed to provide the entire "exemption file" and because Chalmers' testimony did not refer to exhibits that were not timely exchanged under TCR-MD 10.

/ / /

/ / /

## I. STATEMENT OF FACTS

Plaintiff is an Oregon corporation and is "exempt from federal income tax" under Internal Revenue Code (IRC) section 501(c)(4). (Joint Stip Fact at 2, ¶¶1, 6.) Plaintiff's Articles of Incorporation (Articles), adopted in 1933, identify several purposes of Plaintiff, including:

> "To produce and conduct annual competition and exhibition of all frontier sports and pastimes at Pendleton, Umatilla County, Oregon, and any and all other exhibitions, amusements, and entertainments of every kind and character, whether in connection therewith or otherwise * * *.

> "To buy, sell, rent, maintain, hold, occupy improve, use, and enjoy and to convey, lease, mortgage, and pledge real and personal property of every description for any of the purposes herein mentioned or otherwise."

(Ptf's Ex 1 at 63-64.) Plaintiff's Articles state that "no part of the profits of this corporation shall inure to benefit any individual[]" and, upon dissolution, the remaining assets must be given and distributed to "one or more of the institutions, societies, organizations, or public works" described therein. (*Id.* at 64.) Hunt testified that Plaintiff is managed by a board of 16 volunteer directors that meets monthly. He testified that the board conducts operations through about 20 committees on topics including concerts, trademark, dinners, publicity, and parades.

A.    *The subject property*

The subject property is comprised of 15 parcels, one of which, Account 136388, includes the "Main Arena." (*See* Def's Exs J at 2, K at 3.) Hunt testified that the subject property Main Arena holds about 17,000 people. The subject property is owned by Round-Up Holdings, LLC (Holdings). (Joint Stip Fact at 3, ¶14.) Pendleton Round-Up Foundation (Foundation), an Oregon nonprofit corporation exempt from federal income tax under IRC section 501(c)(3), "is the sole member of Holdings." (*Id.* at 2, ¶1, 4, ¶¶22-26.) "Holdings acquired the [subject property] from the City of Pendleton (the 'City') by Statutory Bargain and Sale Deed dated

/ / /

December 9, 2010, and recorded January 27, 2011[].” (*Id.* at 3, ¶17.) Plaintiff leases the subject

property from Holdings for base rent of $10 per year.[3] (Ptf's Ex 1 at 79-80; Def's Ex A at 1-2.)

> "The most-recent major improvement to the [subject property] – the $8
> million complete renovation of the West end of the stadium (known as the
> 'Centennial West Grandstand'), including improvements to the associated
> livestock facilities – was started in 2009 and completed in 2010. The Centennial
> West Grandstand funding was provided through grants made by various
> foundations, State and Federal funding, and a loan of $6 million obtained by
> Foundation from U.S. Bank. Plaintiff is required to repay the $6 million dollar
> loan as part of its rent due under the terms of its lease of the [subject property]
> from Holdings."

(Joint Stip Fact at 10, ¶37.) Culham testified that the West Grandstand renovation budget was $8

million, of which between $2 and $2.5 million was from charitable and public funds. He

testified that Plaintiff enlisted individual and corporate donations for the wrought iron fence and

gate and for the bronze statue. (*See* Def's Ex L at 1.) Culham testified that Plaintiff raised

money for the West Grandstand renovation by selling plaques and cookbooks. He testified that

the Foundation handled financing for the West Grandstand because it is an IRC section 501(c)(3)

and was eligible to receive grant money and public funds.

B.      *Pendleton Round-Up*

"Plaintiff uses the [subject property] to host the annual Pendleton Round-Up (the 'Round-

Up'), which has occurred for 101 years * * *." (Joint Stip Fact at 4, ¶28.) The Round-Up is:

> "One of the largest rodeos in the word, with more than 750 contestants competing
> for prize money in excess of $400,000. The rodeo includes demonstrations and
> competitions by modern rodeo contestants of the many skills that [were] required
> of individuals who came West years ago * * * and other events."

///

///

---

[3] In 2010-2011, Plaintiff incurred "Grounds Leasing" expenses of $731,310.00. (Def's Ex F at 2.) Culham testified that that figure includes both the $10 base rent and payment on a loan to U.S. Bank (discussed below).

(*Id.* at 4-5, ¶28A.)  The Round-Up has been recognized by the Oregon Heritage Commission, the Oregon Tourism Commission, the Oregon Senate, and the 111th Congress.  (Joint Stip Fact at 5, ¶28D-E; Ptf's Exs 2-4.)

Hunt testified that the Round-Up occurs over the course of one week each September and described the typical activities on each day of the Round-Up.  He testified that the rodeo officially begins Wednesday night and Saturday is the finals or championship day of the Round-Up.  Hunt testified that approximately 44,000 people attend over four days of the Round-Up and about 38,000 to 40,000 tickets are sold.  He testified that 2010 was the peak for ticket sales, but tickets sales are relatively consistent from year to year.  "Plaintiff received approximately $1.1 million in revenues from admission tickets sales in 2010, and approximately $954,000 in 2011." (Joint Stip Fact at 5, ¶28B; Def's Exs C, D, E, and F.)  Hunt testified that Fridays and Saturdays of the Round-Up usually sell out, but Wednesdays and Thursdays are a bit slower.  Culham testified that there are often empty seats on Wednesdays and he does not recall having to turn anyone away on a Wednesday because tickets were sold out.  He testified that Monday is free and Tuesday is $2 cash general admission.  Hunt testified that Wednesday and Thursday tickets are $18 to $20.  He testified that tickets for the West Grandstand seats range from $20 to $25 and tickets for the older seats are $18 to $20; tickets for Saturday in the West Grandstand are $25.

Hunt testified that other events are offered in conjunction with the Round-Up, but are not held on the subject property, such as the "Westward Ho!" parade featuring "rolling stock" and the "Buckle Club" dinner for VIPs and out-of-town guests.  (*See* Joint Stip Fact at 6, ¶30C.)

During the Round-Up, Plaintiff provides "a portion of the [subject property] * * * to the Umatilla Tribes and other tribes for a Native American Village where tribal members camp in teepees and undertake [traditional] activities * * *."  (Joint Stip Fact at 6, ¶30A.)  Plaintiff also

provides "space for the Native American Tribal dancing that occurs each day [of the Round-Up] and two American Indian Beauty contests that occur during the Round-Up week." (*Id.* at ¶30B.)

C.     *Plaintiff's community fundraising and other giving*

Plaintiff sponsors and supports various community and charitable fundraising events. (*See* Joint Stip Fact at 7-9, ¶¶34, 36.)  "Plaintiff sponsors a one-day Children's Rodeo for physically and mentally challenged children on the Wednesday before the Round-Up in the stadium." (*Id.* at 7, ¶34.)  "Plaintiff donated a total of $2,677 in 2010 and $2,402 in 2011 for the Children's Rodeo." (*Id.* at 8, ¶34B.)  In 2011, Plaintiff provided 620 free tickets to the Round-Up to the Children's Rodeo participants and their families. (*Id.* at 8, ¶34B.)  "Plaintiff participates in the Wrangler Tough Enough to Wear Pink Program, which occurs one day during Round-Up week." (Joint Stip Fact at 8, ¶36A; *see* Ptf's Ex 9 at 1-8.)  "Donations received from attendees of [the Wrangler] event are provided directly to the St. Anthony Hospital Cancer Care Clinic and the Cancer Community Renewal Project." (Joint Stip Fact at 8, ¶36A.)

In 2011, "Plaintiff hosted returning National Guard soldiers and their families to Thursday's Round-Up in a Yellow Ribbon event." (Joint Stip Fact at 9, ¶36B.)  "Plaintiff provided Round-Up tickets to 65 soldiers and their families at no charge[]" and "also outfitted the soldiers with free T-shirts and Centennial Round-Up pins." (*Id.*)  "On the Saturday of Round-Up in 2011, Plaintiff provided [a fundraising] opportunity for the Wrangler National Patriot Program, a nationally recognized program that provides awareness, support and funding for America's wounded and fallen soldiers * * *." (*Id.*, ¶36C; *see* Ptf's Ex 10.)  In 2011, the program raised $5,874 in total, which was "donated to the Oregon National Guard Emergency Relief Fund in the names of four fallen soldiers who called Pendleton home." (Joint Stip Fact at 9, ¶36C.)  Plaintiff contributed "$4,000 in cash" to the program in 2011. (*Id.*)

"Annually Plaintiff contributes a total of approximately 2,000 free Round-Up tickets to certain individuals and charitable organizations."[4] (Joint Stip Fact at 7, ¶33; *see* Ptf's Ex 7.) Approximately 200 entities receive tickets, which are "either for direct use, or for use in their own funding raising activities[.]" (Joint Stip Fact at 7, ¶33A.) "Other requests for tickets are honored on an as-requested basis from entities from across the region and the State of Oregon, such as private and public schools, symphonies, state and local agencies, foundations and others." (*Id.* at 7, ¶33C.) Culham testified that many organizations that receive free tickets are "charitable," which he defines as exempt from federal income tax under IRC section 501c.[5] He testified that Plaintiff does not have established criteria for whether or when to donate tickets. Culham testified that the free tickets provided by Plaintiff are generally Wednesday tickets.

Culham testified that specific ticket packages donated by Plaintiff include "Family Tix," which is a package containing eight Wednesday tickets for the Round-Up and include a barbeque after the Round Up, as well as tickets to Happy Canyon bull riding.[6] (*See* Ptf's Ex 7.) He testified that the "Rup pack" is a package containing two tickets to the Round-Up (in the West Grandstand) and Happy Canyon[7] and passes to the Hall of Fame. (*See id.*) Plaintiff lists the total value of ticket packages donated in 2010-2011 as $12,166. (*Id.* at 5.) Based on Plaintiff's ticket sales of $954,000 (rounded) in 2010-2011, Plaintiff donated about 1.28 percent of its tickets (as a percentage of value), although Defendant noted that the true figure is less because Plaintiff's ticket donations included Happy Canyon tickets. (*See* Def's Ex F at 1.)

---

[4] The list identified by Culham as "standing ticket donations" totals 1,588 tickets. (Ptf's Ex 7 at 6.)

[5] Culham estimated that 90 to 95 percent of the tickets and items donated by Plaintiff were to "charitable" organizations as he defines that term.

[6] Hunt testified that Happy Canyon is a different organization, started in 1916; he thinks it is exempt from federal income tax under IRC section 501(c)(4). Hunt testified that Plaintiff partners with Happy Canyon to put on a concert and professional bull riding.

[7] Culham testified that Happy Canyon tickets are about $13.

Culham testified that, in addition to tickets, Plaintiff donates goods such as blankets, ornaments, calendars, and other merchandise. (*See* Ptf's Ex 7.) Plaintiff "sets aside approximately $10,000 annually in discretionary funds for 'public relations,' which Plaintiff uses to support community activities by providing donations of souvenir Round-Up related products and/or other in-kind funded donations." (Joint Stip Fact at 9, ¶36E; *see* Ptf's Ex 11.) "In 2011, more than 60 different organizations received donations from Plaintiff through the Public Relations efforts." (Joint Stip Fact at 10, ¶36E.) Culham testified that Plaintiff's public relations budget for fiscal year 2010-2011 also included nominal gifts to those that have hosted directors or the queen and her court.

"Approximately 300 seats for each of the four days of the Round-Up rodeo and related events are made available to members and families of the various Tribes that participate in the Native American Village." (Joint Stip Fact at 7, ¶33D.) Hunt testified that the tickets for the Tribes are for seats in the uncovered East Grandstand.

"Plaintiff provides cash donations to the Foundation, which, in part, uses them to support scholarship programs for local graduating high school seniors and for students of Blue Mountain Community College. In 2011, the total of these scholarships given by [the] Foundation [] exceed[ed] $9,000." (Joint Stip Fact at 9, ¶36D.) Culham testified that there is no written agreement between Plaintiff and the Foundation regarding Plaintiff's funding contribution for scholarships. Plaintiff gave $696,959.13 to the Foundation in 2009-2010 and $295,355.20 in 2010-2011. (Def's Exs E at 4, F at 3.) Culham testified that Plaintiff gives scholarship to the Blue Mountain Community College. (*See* Def's Ex E at 4 ($3,500 in 2009-2010).)

"Plaintiff owns the trademarked bucking horse logo associated with the Round-Up." (Joint Stip Fact at 6, ¶32.) Culham testified that Plaintiff has a "trademark committee" that

decides whether to allow a particular use of the trademark for free or to charge a fee. He testified that Plaintiff allows free use of its trademark by: the City of Pendleton; the Pendleton fire and police departments; the Pendleton Chamber of Commerce; Pendleton School District (the District); and the U.S. Forest Service in Pendleton. (*See* Ptf's Ex 12.)

D.    *Plaintiff's income and expenses; donations to Plaintiff*

Plaintiff provided its "Profit & Loss Reports" from 2008-2009, 2009-2010, and 2010-2011.[8] (Def's Exs E, F.) Plaintiff's gross profit was $4,010,149.07 in 2009-2010 and $3,420,965.95 in 2010-2011. (Def's Exs E at 2, F at 1.) Culham testified, and Plaintiff's profit and loss reports confirm, that the majority[9] of Plaintiff's income is from ticket sales, alcohol sales ("Beer Sales" and "Let 'er Buck Room Sales"), sponsorship, souvenir sales ("Retail Sales", and "HRD [Hood River Distilleries] Royalties."[10] (Def's Exs E at 1-2, F at 1.) In 2009-2010, Plaintiff received income of $210,531.35 from "Let 'er Buck Room sales"; $285,369.00 from "Beer Sales"; and $253,031.00 from "Sponsor Income." (Def's Ex E at 1.) During the Round-Up, food and refreshments are provided by "nonprofit community organizations and commercial vendors," both of which are charged by Plaintiff for booth space. (Joint Stip Fact at 8, ¶35; *see* Ptf's Ex 8.) "During 2010 and 2011, Plaintiff received approximately $52,688 and $42,451 in income, respectively, from booth concession fees paid by vendors." (Joint Stip Fact at 8, ¶35B.)

In 2008-2009, 2009-2010, and 2010-2011, Plaintiff received cash donations ranging from $5,000 to $281,539.49 and non-cash donations[11] ranging from $1,871.16 to $20,653.00. (Def's

---

[8] Plaintiff's fiscal year ends October 31 of each year. The court refers to the fiscal year ending October 31, 2009, as "2008-2009," and the fiscal year ending October 31, 2010, as "2009-2010," and so forth.

[9] Income from each of these sources was in excess of $100,000 in 2009-2010 and 2010-2011.

[10] Culham testified that Plaintiff holds trademarks for the bucking horse logo and the slogan "Let 'er Buck," both of which are licensed to HRD for a fee. (*See* Joint Stip of Facts at 7, ¶32.)

[11] Non-cash donations to Plaintiff include "arena maintenance," "hay donations," and "labor." (Def's Ex E

Exs E at 2, F at 1.) Of the $281,539.49 in cash donations, $249,526.00 is identified as "PWM – Grandstand Donation (their share of HRD * * * [illegible]." (Def's Ex F at 13.) Excluding the $249,526.00 West Grandstand donation, cash donations to Plaintiff totaled $32,013.49 in 2010-2011. As a percentage of total income, donations to Plaintiff ranged from 0.78 to 7.84 percent, or 0.94 percent excluding the $249,526.00 West Grandstand donation. Hunt testified that about 600 to 700 people volunteer for the Round-Up each year. He testified that the Round-Up volunteers are not paid other than through receipt of daily "food scrip" that may be used to buy food from vendors.

One of Plaintiff's largest expenses in 2009-2010 and 2010-2011 was "Salaries & Wages." (Def's Exs E at 3, F at 2.) Hunt testified that Plaintiff used to employ six office staff, but "recently" (as of the date of trial) lost two employees. Defendant noted other expenses including "Parties & Meetings"; "Room 17," which Hunt testified is the meeting location for the board of directors; and "Travel & Lodging." (*See* Def's Exs E at 2-4, F at 2-3.)

E.    *Other uses of the subject property*

"Plaintiff provides access to the [subject property] to some public organizations and private nonprofit entities." (Joint Stip Fact at 10, ¶38.) The District "is granted use of the [subject property] beginning immediately following the Round-Up through the end of the school year (June of each year), and is charged a fee for its use of the [subject property]. In 2010, the District paid $12,525 to Plaintiff for its use of the [subject property], including use of the stadium for football games and other sports * * *."[12] (*Id.* at ¶38A; *see* Def's Ex G-1.) Hunt testified that

/ / /

---

at 13; Ex F at 13.) Culham testified that volunteers helped build the Roy Raylie room.

[12] The parties provided a copy of the May 2008 lease agreement between Plaintiff and the District. (Def's Ex G-1.) That lease stated annual consideration of "$10,525" and "Fifty per cent of all gross gate receipts over $12,115.00 from high school football games each lease year[.]" (*Id.* at 1.)

the lease with the District is not exclusive and Plaintiff periodically schedules other events at the subject property, such as weddings, meetings, and dinners.

The subject property is used during the year by groups including: Pendleton Youth Football; Whiz Kids Wiffle Ball; Umatilla County Panthers; Blue Mountain Community College Rodeo Team; 4-H groups; the Pendleton Junior Livestock Show; Rodeo Bible Camp; and Pendleton High School. (Joint Stip Fact at 10-12, ¶¶38B-38E.) Some uses are free and others are for a fee. (*Id.*) Hunt testified that part of the subject property, Fallon Field, is used by the high school for baseball and also by a little league team. He testified that Fallon Field is open to the public like a park. Hunt testified that, after fall, the subject property arena is winterized and shut down until the spring, which is typically April but could be as late as June. Portions of the subject property are available for rent; the fee varies depending upon whether the renter is a commercial group, a non-profit group, or an individual or small group. (*See id.* at 11-12, ¶38D.) The subject property livestock pens are rented to individuals or groups traveling with livestock; payment "is on a donation 'honor' system." (*Id.* at 12, ¶38F.)

F.      *Application for property tax exemption*

"On or about March 30, 2011, Plaintiff timely filed an Application for Real and Personal Property Tax Exemption" for the subject property. (Joint Stip Fact at 13, ¶39.) "On or about May 16, 2011, [the County] denied Plaintiff's property tax exemption application on the basis that Plaintiff did not meet the requirements of ORS 307.130[]." (*Id.* at 42.)

## II. ANALYSIS

The issue before the court is whether the subject property is entitled to property tax exemption for the 2011-12 tax year under ORS 307.130.[13]   ORS 307.130(2) provides, in part:

---

[13] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

"[T]he following property owned or being purchased by * * * incorporated * * * benevolent, charitable * * * institutions shall be exempt from taxation:

"(a) Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the * * * benevolent, charitable * * * work carried on by such institutions."[14]

Plaintiff leases the subject property from Holdings and so relies upon ORS 307.166 (2011).[15] (*See* Ptf's Post-Tr Mem at 5.)

"Taxation is the rule and exemption from taxation is the exception." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev*. (*Dove Lewis*), 301 Or 423, 426, 723 P2d 320 (1986). Property tax exemption statutes are strictly but reasonably construed. *SW Oregon*, 312 Or at 88-89. "Strict but reasonable construction does not require the court to give the narrowest possible meaning to an exemption statute. Rather, it requires an exemption statute be construed reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent." *North Harbour Corp. v. Dept. of Rev*., 16 OTR 91, 95 (2002). Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev*., 4 OTR 302, 312 (1971).

Plaintiff seeks exemption as a "charitable institution" under ORS 307.130(2). To be a "charitable institution," "(1) the organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving." *SW Oregon*, 312 Or at 89. All three conditions must be met to qualify as a charitable institution within the meaning of

---

[14] "[T]he word 'benevolent' used in connection with the word 'charitable,' as used in the statute, is synonymous therewith." *Methodist Homes*, 226 Or at 309.

[15] ORS 307.166 was amended in 2011 and the amendments were effective for "property tax years beginning on or after July 1, 2011." Or Laws 2011, ch 655, § 4.

ORS 307.130. *Mazamas v. Dept. of Rev.*, 12 OTR 414, 415 (1993). The test is applied to the overall activities of Plaintiff, not a portion thereof. *Mercy Medical Center, Inc. v. Dept. of Rev.* (*Mercy Medical*), 12 OTR 305, 307 (1992).

A.    *Charitable object*

First, Plaintiff must have "charity as its primary, if not sole, object[.]" *SW Oregon*, 312 Or at 89. "The activity conducted by the charitable institution must be for the direct good or benefit of the public or community at large." OAR 150-307.130-(A)(3)(b).

> "At one point this court believed that charity was limited to reliving pain, alleviating disease, or removing constraints. * * * Current definitions for purposes of ORS 307.130 are more generous, and find that it is enough that the activity conducted by the charitable institution must be for the *direct good or benefit of the public or community at large*."

*Lebanon Community Found., Inc. v. Linn County Assessor*, TC-MD No 011005A, WL 1591920 at *2 (July 18, 2002) (citations omitted) (emphasis added).

Plaintiff notes that it "has been recognized as exempt under Section 501(c)(4) of the [IRC] or its equivalent since August 1935." (Ptf's Post-Tr Mem at 7.) IRC section 501(c)(4)(A) exempts from federal income taxation the following organizations:

> "Civic leagues or organization not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."

Plaintiff's exemption under IRC section 501(c)(4) is a factor supporting Plaintiff's claim that it is a "charitable institution" under ORS 307.130(2). However, "the mere fact that an organization is * * * a charity does not establish any inherent right to exemption." *Dove Lewis*, 301 Or at 427.

"The articles and bylaws of a corporation are prima facie evidence of the character of the corporation." *Id.* In *Dove Lewis*, the Court found that the taxpayer was "organized to provide

'emergency small animal veterinary service.' " *Id.* The Court concluded: "Although taxpayer's expressed purposes is beneficial, we cannot say that it is as a matter of law 'charitable,' as that term is used in ORS 307.130. Neither, however, do the articles and bylaws eliminate taxpayer as a charity." *Id.*

Plaintiff asserts that its "charitable purpose is the social welfare it provides to the Community." (Ptf's Post-Tr Mem at 7.) Plaintiff argues that its Articles of Incorporation (Articles) satisfy the first part of the *SW Oregon* test, noting that Article III, Section 2, of its Articles includes the broad language "or otherwise." (*Id.* at 6-7.) Article III, Section 2, states: "To buy, sell, rent, maintain, hold, occupy improve, use, and enjoy and to convey, lease, mortgage, and pledge real and personal property of every description for any of the purposes herein mentioned or otherwise." (Ptf's Ex 1 at 63.)

Based on a review of Plaintiff's Articles and other evidence presented, the court finds that Plaintiff's primary purpose is to organize the Round-Up each year. Plaintiff's other purposes, such as providing the subject property to the District and other organizations, are incidental. In support of that finding, the court notes that other uses of the subject property are subordinate to the Round-Up; the lease agreement between Plaintiff and the District states that the District "shall have possession of the area commencing the first Wednesday after completion of the Pendleton Round-Up each year * * *." (Def's Ex G-1 at 1.) Moreover, the court is not persuaded that charity is a primary purpose of Plaintiff. Plaintiff's Articles do not identify charity as one of Plaintiff's purposes. The phrase "or otherwise" in the Articles suggests that charity is a permissible purpose or activity of Plaintiff, but does not suggest that charity is Plaintiff's primary purpose.

/ / /

Courts often turn to the question of gift or giving to determine whether an organization is charitable. *See Dove Lewis*, 301 Or at 428-29; *see also Portland State University Bookstore v. Multnomah County Assessor* (*PSU Bookstore*), TC-MD No 060824C, WL 323496 at \*5 (Order on Cross Mot for Summ J, Jan 29, 2009) (the taxpayer was not a charitable institution because its performance did not involve an element of gift and giving). Accordingly, the court notes that charity is a permissible purpose of Plaintiff and turns to the "gift or giving" analysis.

B.    *Gift or giving*

In order to be a charitable institution, "the organization's performance must involve a gift or giving." *SW Oregon*, 312 Or at 89. "In determining whether an organization is, by its conduct, charitable, the crucial consideration is the element of a gift or giving." *Dove Lewis*, 301 Or at 428. Gift or giving "is what distinguishes charity from nonprofit." *Samaritan Village Inc. v. Benton County Assessor* (*Samaritan Village*), TC-MD No 001064C at 8 (Jan 23, 2003). "The essence of charity is giving" and "[t]he element of giving must be viewed from the perspective of the recipient \* \* \*." *Goodwill Industries of the Columbia Willamette, Inc. v. Benton County Assessor* (*Goodwill*), TC-MD No 060676D, WL 1168679 at \*5 (Apr 18, 2007) (citations and emphasis omitted). Plaintiff states, and the court agrees, that the element of "gift or giving" is the primary issue presented in this case. (Ptf's Post-Tr Mem at 9.)

Courts have considered numerous factors to determine whether an organization's performance involves a "gift or giving." *E.g., Methodist Homes*, 226 Or at 309-10; *Dove Lewis*, 301 Or at 428-29. "Often, a charitable organization's product or service is delivered to recipients at no cost or at a price below the market price or price to the organization of the product or service." OAR 150-307.130-(A)(3)(d). A nonprofit organization that provides services to recipients meets the element of gift or giving if its services are provided with no expectation that

the organization would be paid or reimbursed for them. *See Goodwill,* WL 1168679 at *5 (citation omitted). Plaintiff charges a fee for its primary service, Round-Up, as well as for many of its incidental services, such as leasing the subject property to other users. "The fact than an organization charges a fee for its services does not necessarily invalidate its claimed status as charitable. It is a factor to be considered in the context of the organization's manner of operation." OAR 150-307.130-(A)(3)(d)(C); *see Samaritan Village*, TC-MD No 001064C at 11-12.

1.    *Plaintiff's fee structure; donations to Plaintiff; volunteer labor*

A fee structure designed to cover all costs weighs against a charitable exemption claim:

"Although the initial donation * * * to start up the clinic may have been given in the spirit of charity, taxpayer was formed with the expectation that it would be self-sufficient. As a consequence, its fee schedule was, and is, structured to cover all costs. Unlike most charitable corporations, which depend on the receipt of donations for their survival, taxpayer's reliance on such funding is minimal."

*Dove Lewis*, 301 Or at 430. Based on Plaintiff's profit and loss reports, Plaintiff's annual total income is more than sufficient to cover its expenses. (Def's Ex E-F.) In fact, Plaintiff has sufficient income each year to make significant donations to the Foundation. (Def's Exs C at 7, D at 14.)

A nonprofit organization meets the element of gift or giving if the organization "receive[s] limited donations * * * [and] appl[ies] those donations and substantial volunteer labor" to its charitable services. *Rigas Maja, Inc. v. Dept. of Rev.*, 12 OTR 471, 475 (1993). The majority of Plaintiff's income is from ticket sales, alcohol sales, sponsorships, souvenir sales, and trademark royalties. As a percentage of its annual total income, donations to Plaintiff are less than one percent, excluding the donation in 2010-2011 related to funding the West Grandstand renovation. Thus, Plaintiff's reliance on donations is minimal.

"The fact that individuals provide volunteer labor to assist the organization in performing its activities may indicate that the organization is charitable. However, it is not a standard in determining whether an organization is charitable per se." OAR 150-307.130-(A)(3)(d)(D). Between 600 and 700 people volunteer for Round-Up each year. Others volunteer to assist Plaintiff with maintenance of the subject property. The willingness of community members to provide volunteer assistance to Plaintiff supports a finding that Plaintiff is charitable.

2.      *"Fee charging operation" under OAR 150-307.130-(A)(3)(d)(C)*

OAR 150-307.130-(A)(3)(d)(C) identifies four factors to be considered in "determining whether a fee charging operation is charitable * * *."

   i.      *Whether the receipts are applied to the upkeep, maintenance and*
           *equipment of the institution or are otherwise employed*

Plaintiff asserts: "After netting out its expenses related to the Round-Up, Plaintiff applies all of its proceeds, other than those set aside for reserves, back into the Property and the Community." (Ptf's Post-Tr Mem at 10.) The evidence presented does not support Plaintiff's contention. "Plaintiff provides cash donations to the Foundation, which, in part, uses them to support scholarship programs * * *." (Joint Stip of Facts at 9, ¶36D.) "Plaintiff also sets aside approximately $10,000 annually * * * for 'public relations,' " which includes gifts and donations of souvenirs and merchandise to charitable organizations. (*Id.*)

However worthwhile, Plaintiff's donation of funds, souvenirs, and merchandise to other charitable organizations does not support Plaintiff's claim that it is a charitable institution. As noted by the Department, "Oregon does not recognize the 'destination of income' from an otherwise non-charitable activity as a basis for exemption." (Def Dept's Closing Arg at 16.) " 'Destination of income' theory does not qualify the property for exemption. For example, use of property by a charitable organization as a bingo parlor to raise money for a charitable activity

is not an actual charitable use of the property, and does not qualify the property for exemption."

OAR 150-307.130-(A)(4)(a); *see also*, *Corp. of Presiding Bishop of Jesus Christ of Latter-Day Saints v. Dept. of Rev.*, 276 Or 775, 778, 556 P2d 685 (1976) ("This court, as well as many other courts, has rejected [the] 'destination of income' theory.")[16] The first factor does not support Plaintiff's claim.

> ii.     *Whether patients or patrons receive the same treatment irrespective of their ability to pay*

Plaintiff concedes that it "sells tickets at various price points," but notes that it provides about "2,000 free tickets every year to various groups – many of which are themselves tax-exempt charities[]" and it provides about "1,200 free seats * * * to Native American spectators." (Ptf's Post-Tr Mem at 10.) Plaintiff's reliance on the tickets that it gives away annually is problematic for several reasons. First, the evidence suggests that some, but not all, of the groups that receive free tickets are "charities." Furthermore, Culham testified that Plaintiff does not have established criteria to determine whether or when it will give away tickets. Additionally, as discussed above, giving tickets and other items to other charitable institutions to use in their fundraising does not, by itself, qualify Plaintiff as charitable institution.

Finally, Plaintiff's level of giving as a percentage of its ticket sales is insufficient to satisfy the element of "gift or giving." As a percentage of value, Plaintiff's ticket donations total 1.28 percent of its tickets. In *YMCA of Columbia-Willamette v. Dept. of Rev.* (*YMCA*), 308 Or 644, 653, 784 P2d 1086 (1989), the Court held that the taxpayer's operations were not charitable even though it maintained policy whereby "anyone who asks and who is in need can be

---

[16] An organization that provides services to "philanthropic foundations" is not, itself, a charitable institution because charity was not its primary object. *Grantmakers for Education v. Multnomah County Assessor*, TC-MD No 021216E, WL 22119790 at *2-3 (Aug 21, 2003). The taxpayer "work[ed] with philanthropic foundations * * * to help them achieve greater efficiency with their giving." *Id.* at *2. Even though the taxpayer provided assistance to the foundations, "it [was] the *foundations* that provide[d] the 'charity' to the educational system, not [the taxpayer.] *Id.* The taxpayer's "activities may impact the community, but only indirectly." *Id.*

permitted to use the facilities[.]" The Court focused, instead, on "[t]he actual relationship of scholarship giving * * * to income" finding it to be "less than four percent" and "the relationship of paying members to partial or full scholarship members is five percent at [one location] and less than eight percent at [the other location]." *Id.* at 653-54. Plaintiff's level of giving is below that in *YMCA*.

        iii.     *Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed*

Plaintiff states that it "does not discriminate on any basis." (Ptf's Post-Tr Mem at 11.) Given Plaintiff's fees, it is difficult to conclude that "the doors are open to rich and poor alike * * *." (*Id*.) However, the court agrees that there is no evidence suggesting that Plaintiff discriminates on the basis of "race, color or creed." OAR 150-307.130-(A)(3)(d)(C)(iii).

        iv.     *Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent*

"Plaintiff concedes that with respect to the Round-Up, other than the free tickets and seats it offers to certain groups, it does not specifically target the indigent for admission into the Round-Up[,]" but notes that "during the year Plaintiff rents the pavilion for approximate one-third the rate charged to commercial users of that portion of the Property." (Ptf's Post-Tr Mem at 11.) There is no evidence before that court that Plaintiff makes lesser charges to the poor and no charges to the indigent. As stipulated by the parties, Plaintiff allows use of the subject property for free or for reduced rates to groups including the District, various youth sports leagues and youth clubs, the community college, and nonprofit organizations. (Joint Stip Fact at 10-12.) However, there is no evidence that such groups are poor or indigent. The fourth factor does not support Plaintiff's claim.

/ / /

### 3.    *Relief of a government burden*

"Relief of a government burden is also an indicator of giving.  [The Oregon Supreme Court] stated in *Friendsview Manor v. Tax Com.* [(*Friendsview*)], 247 Or 94, 105-06, 420 P2d 77, 427 P2d 417 (1967), that one reasonable explanation for the government's decision to exempt charitable enterprises from the payment of taxes is that 'if such enterprises did not exist the government would be required to use tax dollars to do the job the charitable enterprises are now doing.' "  *Dove Lewis*, 301 Or at 431; *see also* OAR 150-307.130-(A)(3)(c).

Several cases are helpful in determining what constitutes a "government burden."  In *Friendsview*, the Oregon Supreme Court "assumed that providing housing for the indigent aged was a governmental burden[.]"  *YMCA*, 308 Or at 658.  In *Goodwill*, this court concluded that the taxpayer "potentially relieve[d] 'a government burden' by providing employment for those who might otherwise be recipients of unemployment or other welfare benefits from the government." WL 1168679 at *5.  Providing "educational opportunities" in partnership with a school district may also relieve a government burden.  *See, e.g., Evergreen Aviation & Space Museum v. Yamhill County Assessor*, TC-MD No 111230D, WL 3646764 at *5 (Aug 27, 2012).

By contrast, a taxpayer that "perform[ed] indigent criminal defense, a burden the state must bear" by law, did "not reliev[e] the state of any financial burden[]" because "[t]he state [] compensate[ed] taxpayer pursuant to the services contract."  *SW Oregon*, 321 Or at 89-90.  The provision of "small animal examination and treatment services," by a taxpayer did not relieve "the county of any appreciable burden."  *Dove Lewis*, 301 Or at 431.  The provision of "physical development facilities" by a taxpayer did not relieve the city of a burden despite the city's "authority or [] power to care for the health of its citizens * * *."  *YMCA*, 308 Or at 656-58. Providing a university bookstore did not relieve a government burden despite the state's "strong

obligation to fund higher education[.]" *PSU Bookstore*, WL 323496 at *5. The court noted that, even assuming the university "would have to operate the bookstore if [the taxpayer] did not exist, it is not clear from the evidence that the government would actually bear any burden because the bookstore is self-funding (*i.e.,* takes in enough revenue to cover its costs)." *Id.*

Plaintiff does not contend that the government has an obligation to put on a rodeo or related festivities. Instead, Plaintiff asserts that "it lessens the burdens of government * * * [by] mak[ing] the [subject property] available to the District for most of the year essentially for free." (Ptf's Post-Tr Mem at 8.) Plaintiff also asserts that the subject property is "used like a public park during the year." (*Id.*) From July 2008 through July 2011, Plaintiff leased part of the subject property to the District for high school football games for $10,525 plus "fifty per cent of all gross gate receipts over $12,155.00 from high school football games during each lease year[.]" (Def's Ex G-1 at 1.) The parties stipulated that, "[i]n 2010, the District paid $12,525 to Plaintiff for its use of the [subject property] * * * for football games and other sports * * *."[17] (Joint Stip Fact at 10, ¶38A.) Fallon Field is used by the high school for baseball and is open to the public like a park. (Ptf's Post-Tr Mem at 8.)

Providing space to the District for its athletic programs for free or at a reduced rate likely relieves the District of a financial burden. However, during the tax year at issue, Plaintiff charged the District a fee for its use of the subject property. As in *SW Oregon*, the District was not relieved of a financial burden because it compensated Plaintiff for its use. Even assuming that Plaintiff "relieves a government burden" by providing the subject property for use by the District and others, that is not Plaintiff's primary purpose as determined above.

/ / /

---

[17] In November 2011, Plaintiff signed a new lease agreement with the District whereby the District may use the subject property for a refundable deposit of $2,500. (Def's Ex G.)

Based upon the factors discussed above, the court finds that charity is not Plaintiff's primary purpose and Plaintiff's performance does not involve "a gift or giving." Although Plaintiff's contributions to its community and to the State of Oregon are undoubtedly worthwhile, the court finds that Plaintiff is not a charitable institution under ORS 307.130(2) and the subject property is not entitled to property tax exemption for the 2011-12 tax year.

## III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that Plaintiff is not a "charitable institution" under ORS 307.130(2) and the subject property is not entitled to property tax exemption for the 2011-12 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ＿＿ day of December 2012.


_____
ALLISON R. BOOMER
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on December 28, 2012. The Court filed and entered this Decision on December 28, 2012.*